UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KENDRA SCOTT,

                Plaintiff,                Case No. 15-cv-14281

v.                                       Honorable Thomas L. Ludington

VALLEY ELECTRICAL CONTRACTORS,
INC.,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

On December 8, 2015, Plaintiff Kendra Scott filed a Complaint against Defendant Valley Electrical Contractors, Inc. ("VEC"). Compl., ECF No. 1. Scott alleges that VEC refused to rehire her after she took maternity leave, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.SC. § 2612, *et seq.*, and the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. L. § 37.2102, *et seq.* Discovery closed on September 2, 2016. ECF No. 10. On September 28, 2016, VEC filed a motion styled, alternatively, as a motion to dismiss and a motion for summary judgment. ECF No. 16. For the reasons stated below, VEC's motion will be granted.

**I.**

Kendra Scott began working at VEC as an office professional in November 2008. Scott Dep. at 59–69, ECF No. 16, Ex. A. VEC provides electrical contracting services to commercial and residential customers in mid-Michigan. *Id.* at 70, 76.

**A.**

At Scott's initial interview, she discussed the job duties and responsibilities with Linda Parsons and Lori Johnson, two VEC employees. *Id.* at 63. Scott alleges that, during the

interview, she asked about job security. *Id.* at 64. According to Scott, she was jokingly told that she would work at VEC until she died. *Id.* Scott admits that there is no written communication between her and VEC which formally guaranteed that Scott had job security for as long as she wanted, but indicates that she took the comment "to heart." *Id.* at 64–65. VEC denies that Scott was told during her interview that she would have a job at the company until she died. VEC also emphasizes that Scott admitted in her deposition that the comment about job security was made as a joke.

When Scott started working at VEC, she had one child, named Abigail Emmons. Benson Dep. at 7, ECF No. 16, Ex. F. Scott almost lost Abigail early in the pregnancy. Scott Dep. at 103. Scott worked at VEC without incident until February 2013, when she discovered that she was pregnant. *Id.* at 21. Because of the complications she experienced with Abigail, Scott did not immediately make her pregnancy public knowledge. *Id.* at 90. Scott alleges that, when she told VEC coworkers she was pregnant, the reaction was mixed. *Id.* at 104. According to Scott, "Jamie never congratulated me my entire pregnancy. Lori hesitantly congratulated me. . . . Linda, her comment to me was we thought you were done having kids and that she heard from Jamie."[1] *Id.* at 104–05.

Scott asserts that Lori Johnson made negative comments about her pregnancy on a "weekly, sometimes daily basis." *Id.* at 21. Specifically, Scott alleges that Johnson asked if Scott would be able to handle five children, how long Scott's maternity leave would be, and whether Scott was going to have a cesarean-section delivery. *Id.* According to Scott, when Scott left for doctor appointments, Johnson would make comments to the effect that "[i]t must be nice to leave to go to the doctor because you're pregnant" or become upset and stop speaking to Scott. *Id.* at

---

[1] Jamie Kennedy is Linda Parson's daughter and an office professional at VEC. Kennedy Dep. at 4–5, ECF No. 16, Ex. I. Linda Parsons is the office manager at VEC. Parsons Dep at 5, ECF No. 16, Ex. B. Lori Johnson is an office professional at VEC. Johnson Dep. at 4–6, ECF No. 16, Ex. E.

24. Danielle Benson confirmed that Johnson asked Scott when and for how long Scott would be taking leave, but did not witness Johnson making the other allegedly harassing comments. Benson Dep. at 11–12. Scott complained to Linda Parsons about the comments, but Parsons told her that there was nothing she could do. Scott Dep. at 30. Johnson denies making any of the alleged comments. Johnson Dep. at 13–14.

In February 2013, Kyra Larson, Linda Johnson's granddaughter, also became pregnant. *Id.* at 14–15. At the time, Larson was a part-time office professional at VEC. Larson Aff. at 2, ECF No. 16, Ex. H. After she became pregnant, Larson informed her coworkers that she was not planning to return to work at VEC after she gave birth. *Id.* Larson voluntarily resigned her employment in June 2013. *Id.* Larson was not replaced by a new employee. Scott Dep. at 28–29. Scott alleges that the office, and specifically Linda Johnson, reacted differently to Larson's pregnancy than to Scott's pregnancy. Johnson admits that she never asked Larson if she would be able to handle her baby or made other comments that could be construed as derogatory. Johnson Dep. at 15–16. Benson testified at her deposition that Johnson seemed more excited about Larson's pregnancy than Scott's pregnancy. Benson Dep. at 20–21.

Scott also argues that VEC employees harassed her regarding an allergy. Scott has a fish allergy. *See* Benson Dep. at 15–16. Further, her VEC coworkers were aware of that allergy. *See id.*; Parsons Dep. at 18; Johnson Dep. at 16. Scott alleges that fish was brought into the VEC office at least twice, once before her pregnancy and once during her pregnancy. Scott Dep. at 95. When the fish was brought in the first time, Scott's eyes swelled shut. *Id.* She asserts that several VEC executives, Jerry Whittington, Mike Parsons, and Mike Tromley, mocked her allergy when the fish was brought in the second time. *Id.* at 95–96.

**B.**

VEC has promulgated a Personnel Policies and Procedures Handbook, which includes policies for employees seeking medical leave. Handbook, ECF No. 16, Ex. D. The Handbook specifies that employment is at-will. *Id.* at 1. It also states that sexual harassment, discrimination, and retaliation are strictly prohibited. *Id.* at 42–43. If an employee believes that they have been discriminated against, they must complete a complaint form to initiate an investigation. *Id.* at 37, 40. Scott does not allege that she ever completed a complaint form. Additionally, the Handbook specifies VEC's policies for FMLA leave. The Handbook explains: "When the need for leave is foreseeable, such as the birth or adoption of a child, . . . the employee must provide reasonable prior notice, and make efforts to schedule leave so as not to disrupt company operations." *Id.* at 15. Employees are directed to submit a form, included in the Handbook, requesting FMLA thirty days in advance of the effective date of the leave, if possible. *Id.* at 15–16; 45

The Handbook also explains that VEC's FMLA policies "apply to all family and medical leaves of absence except to the extent that such leaves are covered under other paid employment benefit plans or policies for any part of the twelve weeks of leave to which the employee may be entitled under this policy." *Id.* at 13–14. At the time Scott and Larson became pregnant, VEC did not have an official policy for leave. Parsons Dep. at 20. However, Parsons told Scott that VEC would give her six weeks of paid leave and cover her insurance for those weeks as well. *Id.* Parsons gave Larson two weeks of paid leave because Larson was part-time. *Id.*

Scott asserts that she never received a copy of VEC's Handbook or specific training in the policies and procedures contained therein. Scott Dep. at 77. However, there is no dispute that Scott did not complete the FMLA request included in the Handbook or otherwise formally request FMLA leave.

**C.**

- 4 -

Scott gave birth to her son, Gavin, on October 7, 2013. Scott Dep. at 107. Her maternity leave began on October 4, 2013. *Id.* at 108. Several weeks after giving birth, Scott stopped by VEC with Gavin. Compl. at ¶ 23, ECF No. 1. While there, Scott was informed that business was slow. Scott Dep. at 120. On November 14, 2013, she emailed Linda Parsons. *Id.* at 119–120. In the email, Scott discussed her schedule in the future:

> When I came in the other day everyone said we were extremely slow. I was thinking about it. Is there any chance of being an hourly full time? Like weeks with Abigail: 8:45-3:15 and no lunch (she is going to be needing extra help after school) she is being tested for a.d.d. and dyslexia. . . . If this can't happen I completely understand and you have been so great helping me. Thank you for that. Just let me know and of course vacations / or if someone has something going on I could stay on those days.

Nov. 14 Email at 1, ECF No 20, Ex. 10.

Parsons responded as follows: "Would it help if you took a lay off until January. Would that give you more time with Abby? I would still cover your insurance, because I know you need that with the little ones." *Id.* Scott replied: "I guess I have a few questions: It would be for sure in January? I really need my job[.] Not sure when I would apply. Next week? That is such a nice offer with everything that is going on." *Id.* Before Parsons responded, Scott sent another email:

> I did talk with [my husband] Tim last night. He thought it might be a good thing for the extra time. . . . Kind of scared not to work but this would give me a little more time to get Abigail on track. Tim said we could make it to January on unemployment. Things get a little tight with the holidays but his work could get us by for now. Thank you so much for everything you have done for me. If something happens and you need me before January I'm here.

*Id.* at 2.

In response, Parsons stated: "I hope this makes this easier for you and Abby. You may be away from me but your [sic] in my thoughts." *Id.* In her deposition, Scott testified that, at the time she took the voluntary layoff, she knew that she would be ineligible for unemployment benefits if she took an FMLA leave. Scott Dep. at 127–28.

On December 9, 2013, Scott emailed Parsons again. In the email, Scott explained: "They have denied my unemployment because I am not seeking work. . . . I have to protest now and was wondering is [sic] you could write. Something with my name, returning to work, with my claim number." Dec. 9, 2013, Email, ECF No. 20, Ex. 11. Parsons then sent a notice to the unemployment agency: "Please be advised that Valley Electrical laid Kendra Scott off with the intentions of bringing her back to work in January 2014." Notice, ECF No. 20, Ex. 12. Scott attended the VEC Christmas party in December, but testified that she did not feel welcome. Scott Dep. at 220–21.

On December 30, 2013, Scott emailed Parsons about her return to work. In the email, she said: "I wasn't sure when my return to work date was going to be. I know you said after the first. Wasn't sure if that was going to be the Monday after the first or later in January. Just let me know. Whatever will work fine with me." Dec. 30, 2013, Email, ECF No. 20, Ex. 13. Parsons responded: "Let's play January by ear, things haven't picked up yet But the [sic] say once January gets here it will." *Id.*

On January 28, 2014, Scott emailed Parsons again. In the email, Scott proposed a work schedule which would be compatible with Scott's family obligations. Jan. 28, 2014, Email, ECF No. 20, Ex. 14. Parsons's response indicated that work was still slow: "So sorry about your unemployment, is there anything I can do to help you out? Things are still slow, but starting to slowly pick up. So, we will have to hold things off until March as far as bringing you back. I hope everything has picked up by then." *Id.*

On March 2, 2014, Scott again inquired about returning to work. March Emails I, ECF No. 20, Ex. 15. Parsons told Scott that she was about to leave for vacation and would respond about returning to work later in the month. *Id.* On March 20, 2014, Scott sent a follow-up email

to Parsons. March Emails II, ECF No. 20, Ex. 16. She offered additional ideas about a reduced schedule when she began working again and asked if she could work at home during her daughter's spring break. *Id.* In response, Parsons told Scott that work was "still slow, but starting to pick up a little. I have no issue with spring breaks. We'll just play it by ear for now." *Id.*

On April 30, 2014, Scott emailed Parsons a final time. April 30, 2014, Email, ECF No. 20, Ex. 17. In the email, Scott stated in part:

> I guess I'm not sure what to do. My unemployment has ran out and I just collected my last check. I'm only assuming I'm not coming back to work at all? I only found out last week from my mom that I guess that is the plan. I had really hoped something, even part time would have worked out. . . . You have done a ton for me and I hope you know how grateful I am.

*Id.*

Parsons replied: "Work had not picked up as of yet. We keep hearing that it's going to but nothing yet. . . . We will hold onto insurance until June the first if that is a help. I'll let you know if anything changes here." *Id.*

VEC did not hire anyone to replace Scott. Parsons Dep. at 44. Although Scott was the only office professional laid off during this time period, VEC also laid off a significant number of electricians and independent contractors. *Id.* at 7, 30, 34. According to Parsons, VEC had 188 employees in November 2012, but only 120 employees as of April 2016. Parsons Aff. at 2, ECF No. 16, Ex. K. Current VEC office employees all testify that work was slow in January 2014 and remains slow. Parsons Dep. at 44; Johnson Dep. at 20–25; Benson Dep. at 24–27.

**II.**

Defendant now moves for summary judgment.[2] A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the

---

[2] Defendant's motion is styled, alternatively, as a motion to dismiss and a motion for summary judgment. Both parties include a significant number of exhibits. And Plaintiff's brief responding to Defendant treats the motion as

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

VEC first moves for summary judgment on Scott's FMLA claims. The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Arban v. West Publ'g Corp*., 345 F.3d 390, 400 (6th Cir.2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2).

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from

---

one for summary judgment only. Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Discovery in this case has closed and the parties appear to have included all relevant evidence with their briefing. Accordingly, judicial efficiency dictates that Defendant's motion be treated as a motion for summary judgment.

§ 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The main distinction between the two theories is the employer's intent. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Id*. (quoting *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003)). In contrast, the central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id*. (quoting *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id*. (citing *Edgar*, 443 F.3d at 508) (emphasis original).

VEC makes a number of arguments in its motion for summary judgment. First, VEC argues that Scott's FMLA claims are untimely. Second, VEC argues that Scott cannot prove that VEC interfered with her FMLA rights. Third, VEC argues that Scott cannot prove a prima facie claim of FMLA retaliation. Fourth, VEC argues that, even if Scott could prove a prima facie case, the company's reasons for offering Scott a voluntarily layoff were not a pretext for discrimination. Fifth, VEC argues that Scott cannot prove a prima facie claim of sex discrimination under the ELCRA. Sixth, VEC argues that, even if Scott could prove a prima facie case under the ELCRA, the company's reasons for offering Scott a voluntary layoff were not a pretext for discrimination.

**A.**

VEC's first argument is that Scott's FMLA claims are untimely. Under 29 U.S.C. § 2617(c)(1), FMLA actions generally must be brought "not later than 2 years after the date of the

last event constituting the alleged violation for which the actions is brought." *Id*. An exception applies where a plaintiff alleges that an employer *willfully* interfered with their rights under the FMLA, in which case the action must be brought "within 3 years of the last event constituting the alleged violation for which such action is brought." 29 U.S.C. § 2617(c)(2). A plaintiff bears the burden of establishing that a violation of the FMLA was willful. *See Hoffman v. Professional Med. Team*, 394 F.3d 414, 417 (6th Cir. 2005). To do so, a plaintiff must show that a defendant "act[ed] with knowledge that its conduct is prohibited by the FMLA or with reckless disregard of the FMLA's requirements." *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004).

Scott accepted the voluntary layoff on November 15, 2013. However, she did not file her Complaint until December 8, 2015. Thus, if the adverse employment action Scott is challenging was the voluntary layoff, her FMLA claims are untimely absent a showing of willful interference. Scott argues that she was not actually terminated until June 2014, when she discovered that she would not be rehired by VEC and her insurance benefits were terminated.

In her response to VEC's motion for summary judgment, Scott does not attempt to argue that VEC willfully interfered with her FMLA rights. Even if she had, Scott has not produced any evidence of willfulness. She admits that she never specifically requested FMLA leave. There is simply no evidence that VEC acted "intentionally or recklessly" to violate Scott's FMLA rights. *Crugher v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014).

The initial voluntary layoff occurred outside the FMLA statute of limitations and thus Scott's claims are time-barred to the extent they challenge the voluntary layoff. *See Woida v. Genesys Reg'l Med. Ctr.*, 4 F. Supp. 3d 880, 898 (E.D. Mich. 2014). *See also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of

discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."); *Shepard v. United States*, No. 09-10457, 2009 WL 3106554, at *1 (E.D. Mich. Sept. 18, 2009) ([T]here is no legal precedent for applying the continuing violations doctrine to FMLA claims."). VEC's decisions to not rehire Scott are employment actions that are distinct from the decision to offer Scott a voluntary layoff.

VEC, however, argues that the decisions to not rehire Scott were not discrete adverse actions, meaning all of Scott's FMLA claims are untimely. VEC argues that the initial voluntary layoff was the only adverse employment action that Scott suffered. In support, VEC cites *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). In *Vincent*, the Sixth Circuit explained that an "employer's decision to discharge an employee is a classic example of an adverse employment action." *Id.* The defendant argued that the employee chose not to return to work, which meant there was no adverse action. The Sixth Circuit rejected that argument, explaining there was a material issue of fact about whether an adverse action occurred because evidence was presented that the company "would always contact a laid-off employee if it desired the employee to return to work." *Id.*

Likewise, there is a material issue of fact regarding whether VEC's decision to not rehire Scott was an adverse employment action. Although VEC did not formally promise Scott that she would be rehired, Parsons's original email indicated that the layoff would be only until January, and Scott clearly accepted the offer under the belief that she would be rehired. The FMLA provides that any employee who takes FMLA leave is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C.A. § 2614(a)(1)(A). Scott has presented sufficient evidence to create a genuine issue of material fact

regarding whether VEC's decision to not rehire her was an adverse employment action under the FMLA. Thus, Scott's FMLA claims will not be dismissed as untimely.

**B.**

VEC next argues that Scott cannot establish a prima facie case of FMLA interference. FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."

To establish a prima facie case of interference, a plaintiff must prove that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice of her intention to take leave to her employer; and (5) the employer denied her FMLA benefits to which she was entitled. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). VEC does not dispute that Scott has established the first three elements. But VEC argues that Scott has not demonstrated a prima facie case of the fourth and fifth elements.

VEC first asserts that Scott does not satisfy the fourth element because she never actually requested FMLA leave from VEC. "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). However, an "employee does not have to expressly assert his right to take leave as a right under the FMLA." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Rather, "'[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Brohm*, 149 F.3d at 523 (quoting *Manuel v. Westlake Polymers Corp.*,

66 F.3d 758, 764 (5th Cir.1995)). In *Brohm*, the Sixth Circuit affirmed the district court's dismissal of the FMLA claim, explaining that Brohm offered "no evidence that he requested medical leave while he was employed." *Id.*

Scott argues that although she did not expressly request FMLA leave, she did provide sufficient notice of her pregnancy to reasonably apprise VEC of the need for medical leave. VEC clearly had sufficient notice that Scott had a qualifying condition for FMLA leave (pregnancy) and that leave was necessary. In fact, VEC had offered Scott six weeks of paid leave. It does not appear that Scott was informed that she could request additional unpaid medical leave under the FMLA. However, Scott never requested or indicated a desire for additional medical leave. Instead, the emails which she sent to Parsons indicated a desire to work fewer hours in order to spend more time with her children. *See* Nov. 14 Email at 1 ("Is there any chance of being an hourly full time?"). Parsons's response also reflected that understanding: "Would it help if you took a lay off until January. Would that give you more time with Abby?" *Id.* Scott never indicated that she was medically unable to return to work or desired additional medical leave.[3] In fact, the record demonstrates that Scott specifically chose to take the voluntary layoff instead of FMLA unpaid leave because the layoff would entitle her to unemployment benefits. When Scott accepted Parsons's offer of a voluntary layoff, she explained that "Tim said we could make it to January on unemployment." *Id.* More importantly, Scott admitted in her deposition that she knew at the time she accepted the layoff that FMLA leave would not qualify her for unemployment benefits:

---

[3] Scott argues that she requested the schedule change, in part, because her daughter, Abigail, was being tested for attention deficit disorder and dyslexia. *See* Pl. Resp. Br. at 14. But Scott never indicated that she needed to take medical leave to care for Abigail and never provided VEC with medical documentation of the conditions, as required by VEC's Handbook. *See* Handbook at 14. Even if she had, Abigail's conditions do not qualify as "serious medical conditions" under the FMLA. *See Perry v. Jaguar of Troy*, 353 F.3d 510, 516 (6th Cir. 2003) (holding that a child diagnosed with ADD and ADHD did not have a serious health condition sufficient to qualify the child's mother for FMLA leave).

Q: Now did you understand that if you took the voluntary layoff that you could apply for unemployment?

. . .

A: Yes.

Q: So if you take a voluntary layoff, you would be paid weekly whatever amounts they subsequently provide you?

A: Yes.

Q: Okay. And did you have an understanding at that time if you were on FMLA that you would not be paid; correct?

A: Correct.

Q: So by you going off on unemployment you were receiving $362 a week more than what you would have received had you been on FMLA; correct?

A: Yes.

Scott Dep. at 127–28.

Scott requested unemployment benefits soon after accepting the voluntary layoff. *See* Dec. 9, 2013, Email.

Thus, Scott never requested or indicated a desire for additional medical leave beyond the six weeks paid leave she was provided. Rather, her emails, actions, and testimony indicate that she preferred unemployment benefits to unpaid FMLA leave.[4] Given Scott's free choice of and apparent preference for unemployment benefits, VEC did not have a duty to offer Scott unpaid FMLA leave, absent a request or other indication that she was interested in unpaid leave. *See Anderson v. McIntosh Const.*, LLC, 597 F. App'x 313, 315 (6th Cir. 2015) ("[T]he FMLA places no duty on an employer to grant leave without a request or notice from an employee."). To hold

---

[4] Scott consistently represents that VEC forced or coerced her into accepting the voluntary layoff, but has offered no evidence to support that assertion. *See* Pl. Resp. Br. at 15, 17–18. Rather, the emails between Scott and Parsons indicate that Scott voluntarily accepted the layoff. In fact, the emails reflect that Scott was grateful for the accommodation. *See* Nov. 14, 2013, Email ("Thank you so much for everything you have done for me."); April 30, 2014, Email ("You have done a ton for me and I hope you know how grateful I am.").

otherwise would allow Scott to receive all the advantages of FMLA leave without the disadvantage of foregoing unemployment compensation. Thus, Scott has not established the fourth element of the prima facie case of FMLA interference.[5] Her FMLA interference claim will be dismissed.

### C.

VEC next argues that Scott cannot establish a prima facie case of FMLA retaliation. To make out a prima facie case of FMLA retaliation, Scott must show that "(1) she availed herself of a protected right under the FMLA by notifying [VEC] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The primary focus of FMLA retaliation claims is "the motive of the employer." *Id.* at 512. That is, the focus is whether "the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights." *Id.* (emphasis in original). Because, as already explained, Scott did not request or indicate a desire for FMLA leave, VEC's decision to not rehire her cannot be construed as FMLA retaliation. Because there was not an explicit or implicit request for FMLA leave, VEC's decision could not have been motivated by an exercise of FMLA rights. Scott's claim of FMLA retaliation will be dismissed.

### D.

Finally, VEC argues that Scott cannot prove a prima facie case of sex discrimination under the ELCRA. The ELCRA contains prohibitions against an employer discriminating against an employee on the basis of the employee's gender or pregnancy. Mich. Comp. Laws §

---

[5] Because Scott has not satisfied the fourth element of the prima facie case, the Court need not consider whether she has satisfied the fifth element.

37.2202(1)(a)–(d). Discriminatory treatment can be established by direct evidence or indirect and circumstantial evidence. *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 469 Mich. 124, 132 (2003). Scott does not argue that there is direct evidence that VEC engaged in pregnancy discrimination. Accordingly, Scott must proceed under the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of pregnancy discrimination under the ELCRA, the plaintiff must establish that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (citations omitted).[6] For the purposes of this motion, VEC does not contest that Scott has established the first three elements. But VEC argues that Scott has not satisfied element four.

When a "termination arises as part of a work force reduction," the plaintiff must provide "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir.1990)). *See also Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 717 (1997). A work force reduction occurs when "business considerations cause an employer to eliminate one or more positions within the company" and the employee is not replaced. *Barnes*, 896 F.2d 1457, 1465 (6th Cir. 1990).

VEC asserts that work has been slow since Scott accepted the voluntary layoff and that the number of VEC employees has declined from 188 to 120. Scott does not contest either

---

[6] For analytical purposes, the ELCRA resembles federal law and the same general evidentiary burdens prevail as in Title VII cases. See *In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

assertion and has offered no contradictory evidence. Scott also does not argue that VEC has hired an individual to replace her. At best, Scott asserts that other office employees have been forced to work additional hours. *See* Scott Dep. at 115–16 ("A: I was just told that there was various times they were so busy Danielle took work home and cried to Linda. Q: Okay. And when was that? A: Last year is when I believe Linda had to step up and start helping Danielle. . . . And it was sometime last year or 2014 where it was indicated that Danielle stated that she couldn't keep up with the workload that Linda made the comment we could find someone to help you if Kendra wasn't doing what she was doing."). Notably, Danielle Benson testified that work was slow during the time in question and, when asked if she had worked overtime in January, stated "I've never worked overtime, no." Benson Dep. at 24. Regardless, *Barnes* makes clear that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." 896 F.2d at 1465. Thus, the adverse employment action here occurred as part of work force reduction. For that reason, Scott must show "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.*

Scott has not provided any additional evidence of discrimination. She alleges that Linda Johnson was less excited about Scott's pregnancy than she was about Kyra Larson's pregnancy. Because Kyra Larson was Linda Johnson's granddaughter, that allegation is plausible. But even if Johnson was more enthusiastic about Larson's pregnancy, that is not evidence of discrimination. Scott also argues that Johnson made a number of derogatory comments to Scott while she was pregnant. But Johnson was not Scott's supervisor, and there is no evidence that Johnson had any influence over Parsons's decision to offer Scott a voluntary layoff or VEC's

decision to not rehire Scott. Finally, Scott also argues that VEC discriminated against her when VEC employees brought fish into the office despite knowing that Scott was allergic. Even assuming that to be true, Scott has not provided any evidence that this incident occurred because she was pregnant. In fact, Scott indicated that fish had been brought into the office at least once before she became pregnant. Simply put, Scott has not demonstrated a connection between any harassment she received due to her fish allergy and her pregnancy. There is no genuine issue of fact regarding whether Scott's pregnancy or sex was the determining factor in VEC's decision to not rehire her.[7] Rather, VEC's assertion that work was too slow to hire additional office personnel stands unrebutted by Scott. Scott's claim of pregnancy discrimination under the ELCRA will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Defendant VEC's motion for summary judgment, ECF No. 16, is **GRANTED.**

It is further **ORDERED** that Plaintiff Scott's complaint, ECF No. 1, is **DISMISSED with prejudice.**

Dated: December 6, 2016   s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

[7] Scott makes the cursory argument that she was singled out because Danielle Benson was younger and less experienced but was not laid off. *See Barnes*, 896 F.2d at 1466 ("[A] plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff."). This argument is unpersuasive. Scott was offered a voluntary layoff in response to Scott's request for an adjusted schedule. VEC did not choose to layoff Scott over Benson. Rather, Scott voluntarily accepted the layoff. And even if Scott had been singled out for layoff, Scott has not proffered any evidence that Scott was more qualified than Benson. Bare assertions that Scott was older than Benson and had worked at VEC slightly longer are insufficient to establish a prima facie case that Scott was more qualified.

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 6, 2016.

                                s/Michael A. Sian
                                MICHAEL A. SIAN, Case Manager